**Sandra S. COVINGTON, Plaintiff**

v.

**BOARD OF REVIEW OF the INDUSTRIAL COMMISSION OF UTAH, DEPARTMENT OF EMPLOYMENT SECURITY, Defendants.**

No. 21039.

Supreme Court of Utah.

April 22, 1987.

Waine Riches, Salt Lake City, for appellant.

K. Allan Zabel, Linda Wheat Field, Winston M. Faux, Salt Lake City, for respondent.

ZIMMERMAN, Justice:

Plaintiff Sandra S. Covington seeks a reversal of the Board of Review's decision denying her unemployment compensation benefits. Covington raises three issues: first, whether the Board erred in finding that she lacked good cause to voluntarily terminate her employment; second, whether the Board denied her equal protection by requiring that she, as a corporate officer, satisfy a higher standard of conduct than that applicable to ordinary employees before she could be declared eligible for benefits; and, third, whether equity and good conscience require that she be awarded benefits even in the absence of good cause. We conclude that the Board erred in imposing an artificially high standard of good cause and, therefore, reverse and remand for further proceedings.

Covington began working for Control Agency, Inc., a manufacturers' representative, in 1981. In 1984, she, John Bryce, and Michael Crosby bought the company and took over its management. Covington acquired shares in the company representing 20 percent of the outstanding stock. Bryce

owned the remaining 80 percent. Bryce became president, Crosby secretary, and Covington vice-president. Covington was employed as an office manager, was charged with the hiring and training of personnel, and was responsible for breaking in new territory. She drew a salary of $2,000 a month.

In the spring of 1985, the company experienced severe cash flow difficulties. Bryce decided to place all sales people on a straight commission, as all corporate income was based on commissions. Bryce also discussed with Covington the impending need to lay off employees. He told her that she would be laid off third to last, just before a salesman who was the company's main revenue producer. Covington discussed concerns she had about her own position and Bryce's management of the company with Crosby, who shared her concerns. They proposed other management alternatives to Bryce but he rejected them. Crosby and Covington then asked Bryce to produce the company books for examination. During their meeting, Bryce became so angry that he threw the books at Covington. Although she started to leave, she forced herself to calm down and to continue the meeting in an attempt to resolve the company's severe cash flow problem.

On August 4th, Covington took an additional part-time job in anticipation of Bryce's announced decision to implement pay cuts. A meeting was scheduled for August 5th, at which time Covington was to be placed in outside sales. Because she felt ill-prepared for the new job duties Bryce proposed to give her, she came to that meeting with a proposed contract that would assure her a specific territory for a specific period of time while she got up to speed in the new position. When Covington raised the issue at the meeting, Bryce, in front of the entire staff, reminded her of a time when a previous owner had wanted to fire her and Bryce had backed her up. Covington asked Bryce to discuss the matter privately, as it had no bearing on the subject matter of the meeting. When Bryce refused to stop, Covington walked out of the meeting with the words, "I quit."

In her appeal from the Department of Employment Security's denial of benefits, Covington stated that she had left her job because her salaried position was terminated, she was placed upon commission without a contract, and her authority and status with the personnel under her management had been undermined. At the hearing before the administrative law judge, she expressed frustration that her several attempts to work things out with Bryce had been futile because he had made all decisions unilaterally and without listening to Crosby or Covington. Both Covington and Bryce admitted to the administrative law judge that the humiliation Covington was subjected to at the last meeting was the culmination of several months of deteriorating relations between the two. Basing her decision on those facts, the administrative law judge found that Covington had shown good cause for leaving and awarded her unemployment compensation benefits.

In reversing the administrative law judge, the majority of the Board of Review relied exclusively on the conduct occurring at Covington's last staff meeting. The Board ruled that Covington's decision to quit was not reasonable, although she might have been offended at Bryce's public discussion of a private matter. It added that because Covington had a proprietary interest in the employer, she had a duty beyond that of a normal employee to attempt to weather the storm. The Board found that her actions did not constitute good cause and, "for the same reasons as stated above," did not support a finding that it would be contrary to equity and good conscience to impose a disqualification.

In considering whether Covington showed good cause to voluntarily terminate her employment, our review of the Industrial Commission's findings of fact is limited to determining whether they are supported by substantial evidence. Utah Code Ann. § 35–4–10(i) (1985); *Salt Lake City Corp. v. Department of Employment Security*, 657 P.2d 1312, 1315 (Utah 1982). However, on most questions of statutory construction our review is plenary with no deference accorded the administrative agency's determination. *Id.* at 1316.

■ In the case before us, the majority of the Board of Review ignored a substantial part of the record evidence before it and selected an isolated incident to deny Covington unemployment benefits. That action was arbitrary and capricious and cannot stand. Under the Board's own rules and regulations, "good cause" to quit is established if a claimant shows that actual or *potential* physical, mental, *economic*, personal, or *professional* harm would occur by continuing in her employment. Good cause is not shown if a claimant could have continued working while looking for other employment, had reasonable alternatives that would have preserved her job, or failed to give the employer notice of the circumstances causing the hardship and thereby allow the employer an opportunity to rectify the hardship. Rule A71–07–1:5(I)B.1.a and b, Department of Employment Security Rules and Regulations.

■ Covington testified that her income would have been drastically reduced by her shift in employment duties. Bryce stated that her severance pay of one month's salary of $2,000 was far in excess of what she would have made under a new commission status. The record also indicates that Covington was unfamiliar with outside sales because she had been chiefly involved in managerial and administrative work. Consequently, the shift in her duties boded a loss of expertise and a concomitant loss of income. That evidence satisfies the element of potential economic and professional harm as contemplated by the Department of Employment Security Rules and Regulations. The testimony of both Bryce and Covington is replete with references to meetings and encounters in which Covington expressed her dissatisfaction and requested alternative solutions to dealing with the financial crisis of the company. That evidence is sufficient to show that Covington had given notice to her employer and had no other reasonable alternative that would have preserved her job.

■ The transformation of a claimant's duties with no assurance of continued employment was considered an offer of new work, which the claimant justifiably refused in *Luoma v. Employment Divi-*

*sion,* 27 Or.App. 913, 558 P.2d 366 (1976). Where an employer unilaterally changed working conditions of a claimant employed under a verbal agreement, the reviewing court found that the claimant had good cause to terminate her employment rather than accept the change. *Wade v. Hurley,* 33 Colo.App. 30, 515 P.2d 491 (1973); *see also Jones v. Review Board,* 399 N.E.2d 844 (Ind.App.1980). In *United States Steel Corp. v. Department of Employment Security,* 523 P.2d 854 (Utah 1974), this Court held that journeymen millwrights had not left their employment voluntarily without good cause when they refused to accept work as laborers. "To interpret the law so as to compel a person confronted with pending unemployment to accept *immediately* a position below his skill would be to create a situation where a person was coerced by economic pressure to abandon his hard-earned training and experience." *Id.* at 856 (emphasis in the original). The same reasoning is applicable when a change in employment is forced upon an ill-prepared employee, a change that is not part of the employee's expertise and that will result in a loss of earnings. Good cause is established if the conditions that caused the employee to quit are the product of external pressure so compelling that a reasonably prudent person, exercising ordinary common sense and prudence, would be justified in quitting under similar circumstances. *Larry Munger Enterprises, Inc. v. Industrial Commission,* 716 P.2d 808, 810 (Utah 1986); *accord Box Elder County v. Industrial Commission,* 632 P.2d 841 (Utah 1981) (adequate health reasons constituted good cause to justify termination).

■ Covington's second claim, that the Board of Review denied her equal protection, is easily resolved on statutory grounds. "Employment means any service performed ... including service ... as an *officer of a corporation* performed for wages or under any contract of hire, written or oral, expressed or implied." Utah Code Ann. § 35–4–22(j)(1) (1985) (emphasis added). Benefits are payable to *any individual* who is or becomes unemployed and eligible for benefits. Utah Code Ann. § 35–4–3(a) (1985) (emphasis added).

Therefore, neither the Employment Security Act nor the Department's own rule and regulation on "good cause" supports a construction that proprietary interest or stock ownership requires a higher duty of an employee. The majority of the Board of Review erred as a matter of law in holding Covington to a higher standard of "weathering the storm."

Because our review of the Commission's findings of fact is very limited, and because the record evidence could provide adequate support for findings that would result in the denial of benefits to Covington under the proper good cause standard,[1] we remand the matter to the Board and direct that it redetermine the matter under the correct legal standard.

HALL, C.J., STEWART, A.C.J., and HOWE and DURHAM, JJ., concur.

---

1. For example, the record before the Board would have permitted it to find, as a factual matter, that Covington had not intended to leave before the final meeting with Bryce and that she quit on an impulse after becoming angry with him. There is also evidence from which the Board could have found that Covington could have continued to work while seeking other employment or had reasonable alternatives to preserve the job. Because there is conflicting evidence on these matters, we do not attempt to resolve them here. *See, e.g., Members of Iron Workers' Union of Provo v. Industrial Commission,* 104 Utah 242, 248, 139 P.2d 208, 211 (1943); *Continental Oil Co. v. Board of Review,* 568 P.2d 727, 729–30 (Utah 1977); *Whitcome v. Department of Employment Security,* 564 P.2d 1116, 1118 (Utah 1977); *Baker v. Department of Employment Security,* 564 P.2d 1126, 1127 (Utah 1977); *Taylor v. Department of Employment Security,* 647 P.2d 1, 1–2 (Utah 1982); *Trotta v. Department of Employment Security,* 664 P.2d 1195, 1198 (Utah 1983).